Case number 21-1130 et al. Intelligent Transportation Society of America, an American Association of State Highway and Transportation Officials Petitioners versus Federal Communications Commission and United States of America. Mr. Turner for the petitioners Intelligent Transportation Society of America et al. Mr. Geeman for the petitioner Amateur Radio Emergency Data Network. Mr. Novak for the respondents. Morning. Mr. Turner, you may proceed when you're ready. Thank you, Your Honor. May it please the court, Joshua Turner on behalf of Transportation Petitioners, ITS America, and the American Association of State Highway and Transportation Officials. The FCC has taken an extraordinarily broad view of its authority to determine what is in the public interest. So broad that they say it's not even impacted by Congress's decision to mandate the creation of a program designed to reduce the nearly 40,000 deaths every year on the highway. Is fully supporting that congressional priority in the public interest? The FCC says no. In doing so, the FCC has, in DOT's own words, and this is at JA 536, substituted its own judgment for transportation safety matters for that of transportation safety stakeholders whose overriding concern is trying to make the roads safer and who believe that the ban are critical for doing so. There's a reason that my clients, which include all 50 state DOTs and a cross section of transportation safety professionals, brought this challenge. And the groups like the American Traffic Safety Services Association, National Safety Council, and Mothers Against Drunk Driving, among others, are amici supporting our position. To understand the commission's error, you really only need to focus on a few paragraphs of the order. The first, paragraph 123, and that's at JA 639, is the only place that the FCC substantively addresses Congress's enactment of the Transportation Equity Act. In just a few sentences, the order waves Congress's views aside and concludes that, quote, all Congress required, unquote, from the commission was to complete a rulemaking following the statute's enactment. The commission doesn't give any serious consideration to the congressional priorities embodied in the Transportation Equity Act, nor does it wrestle with the fact that Congress also delegated authority to DOT to design and manage the Intelligent Transportation Program, and that it is DOT, not the FCC, that has the expertise to do that. Mr. Turner, as I read the Transportation Equity Act, it doesn't require really anything in particular other than attention to the emerging intelligent transportation, you know, possibility. It sets up a lot of, you know, urging study and drawing on various expertise and considering this and considering that, and so I just wonder what safety benefits does it require that support your claim that safety benefits are certainly lost as a result of the order you challenge? Like, what is the act that's required that wasn't taken? Well, so, Your Honor, a couple of points on that. I agree with you that there's no specific safety benefit that is mandated in the program, because what the program does is give the authority to DOT to design and manage the program, and Congress understood that this is a dynamic situation and that there would be safety benefits that would occur over time that DOT should consider and put in place. What do we make of the fact that DOT no longer has that position? Well, Your Honor, two things on that. One, I don't think we can confidently say that DOT no longer has that position, because what the United States filed was a brief saying, we have joined the FCC's brief after considering all of the various different equities, including the FCC's position. They notably did not say that DOT had changed its position, but more importantly, it doesn't matter. It doesn't matter. Are you familiar with the famous case, where do I have it, the Castle case that Judge Wald wrote back in the early 80s? No, Your Honor, I'm not familiar with that off the top of my head. It's a wonderful essay on the unitary executive pointing out that President Carter was entitled to ignore EPA's views, and she made clear in that opinion that single issue agencies often don't have the right answer, and the President's entitled to consider broader spectrum. Understood, Your Honor. But the important point here is that at the end of the day, the order being challenged here is an order by the FCC, and the Administrative Procedures Act requires the FCC to have evidence in front of it that it can rely on. And so what matters here is not what DOT thinks about the order now, today, what the President thinks about the order now, today. What matters is the evidence that DOT put into the record, and that's at JA 536 in the November 9th letter, DOT issued a scathing letter saying, you haven't listened to us, you haven't consulted us, you haven't addressed any of our objections to this program, none of the stuff that you're going to be discussing. In light of the fact that the government has taken the side of FCC, an independent regulatory agency, as against the government department, can't we conclude the government department's views are no longer espoused by the executive branch? Why are they relevant anymore? Well, I think the government's, the independent agency's views were relevant at the time that the FCC issued its decision, because that was the record. I'm not talking about the independent agency, I'm talking about DOT. Right, I'm sorry. DOT's views were relevant at the time that the independent agency issued its decision, because that was what was on the record before it. That's all that the independent agency had. It had to consider the record that was before it and make its decision. DOT said, you're not doing the right thing here. And that's relevant because DOT has that expertise in determining what is and is not a transportation safety function. So the commission did have extensive comments, as you point out, from DOT considered those. What more would the commission have had to do to fulfill its duty of consultation in your view? Well, so a couple of things on that, Your Honor. I mean, first of all, we think that the duty of consultation is an independent duty that is established by the act. And you can't just say, oh, we took public comment, and we fulfilled our duty of consultation. Because if all you were going to do is take public comment, then the statute wouldn't need to say you need to consult, right? But you didn't make that surplusage argument in your opening brief, did you? I'm sorry? You didn't make that argument that the duty to consult would be rendered statutory surplusage if all it meant was that you had the same opportunity as everyone else to comment under the APA. You didn't make that argument in your opening brief. I apologize, Your Honor. I haven't looked back at our opening brief to find that. But I think we certainly are making, if we did not use the term surplusage, we certainly made that point, which is that the consultation obligation is an independent obligation that is broader than simply doing what you normally do. There is a dispute that there was consultation when the 75 megahertz of the 5.9 spectrum was initially set aside back in whatever it was, 1999, right? There was consultation then. There did seem to be consultation then, Your Honor. And so that's another thing that I think- But wait a minute. Why isn't that enough? Why isn't that enough? Because I don't think, I don't read the Transportation Equity Act as being a one-time shot the way that the commission does. The commission seems to say, look, the only thing we needed to do was consult once, and then in 1999, we were done. And then after that, our authority under the Communications Act springs back into place, and we don't have to think about the Transportation Equity Act again. And I don't read the statute that way, and I submit to Your Honor that it wouldn't make a whole lot of sense to read the statute that way. Because as we say in our brief, if that were the case, then the commission could simply turn around the day after and decide that it was going to ban intelligent transportation programs in the United States, and no one would have a thing to say about it. Now, the FCC- That might be arbitrary and capricious. I'm not sure that it would violate the act, but think about it this way. Let's say at the beginning in 1999, what the FCC did was allocate 30 megahertz of spectrum. And what DOT wanted was 75. Does that mean that every single time the FCC allocated any other spectrum to any other party that the FCC would have had a duty to consult, DOT says, hey, we should be getting that? That's impossible to me. And that seems to flow from your reading. No, no, no. I think, Your Honor, that is a more aggressive reading than we would give. Our point is that to the extent the FCC is acting on the intelligent transportation program... Now, Your Honor, if the commission were to say, we've allocated 75, and we're thinking about taking 15 away from that, then yes, I think that triggers the duty to consult. If Your Honor is saying that because there's a duty to consult any time spectrum becomes available, they need to ask DOT if it wants it first, I mean, I don't think there's a right of first refusal here. But wouldn't there be under your reading if there's a continuous duty to the extent that it has an impact on the intelligent transportation program as DOT defines it? And if DOT at the beginning said, we need 75 megahertz to do all this real-time, no line-of-sight technology, and you've fallen short, then don't they have a duty to consult every time that that spectrum gets allocated elsewhere under your reading? No, Your Honor, I think they have a duty. I think the duty to consult is continuous. But I don't think that it is the case that the commission therefore has to give a right of first refusal to the DOT. I mean, I just don't see that in the statute. Not a right of first refusal, but a right of consultation in your reading. I'm just taking what I understand to be your reading, that it's not a one-time obligation where this is sort of something coming on the scene, you know, let's all consider it, let's get DOT in this business, but no real specifics about what DOT needs to do. And, you know, FCC participated in that inaugural moment. But Your Honor, so two points on that. I think, one, the alternative is just as crabbed, the alternative reading is just as weird, because if you assume that the FCC only has a duty to consult once, then you end up in a situation where the commission could reassign the spectrum without any consultation, we're not even hearing public comment from DOT, and that doesn't make a lot of sense. Well, in this case, they did have public comment, right? Correct. Why wasn't that adequate, even if you were legitimately had raised the consultation in your opening brief? Well, why isn't that legitimate? So, Your Honor, I think in our opening brief, we make a couple of points here, right? We say that the Transportation Equity Act imposes a heavier burden on the FCC. I'm just asking about consultation now. Department of Transportation is perfectly happy as far as we're concerned, in this case, at this point, with the consultation they got. So, Your Honor, I think the consultation, if you had seen real and meaningful consultation, you wouldn't have seen DOT in November of 2020 coming in and saying, you didn't talk to us, and you ignored all of our... Apparently, that's not their view now. But Your Honor, I mean, again, sort of going back to the point, I think the view that matters is the view that predated the order, because that's all the FCC had in front of it when it was passed. It did have the comments, didn't it? It did have the comments, yes, Your Honor. And why wouldn't that be adequate consultation? Because I don't believe that... Did they have to meet in a telephone booth? No, Your Honor, but I do think they have to do more than what they would be obligated to do with any other party. And what would more be? I think in this case... On the phone? Well, in this case, we don't know what they did, because the commission didn't recite anything in its order explaining what it did in terms of consultation beyond saying, hey, we took public comment. What else would be required? Tell me, what would be required? I think one thing... Going to lunch? I think, Your Honor, you can understand in part whether or not the consultation was meaningful by the results of the consultation. That doesn't mean... No, I mean, Your Honor, I think the FCC... Your case is the FCC was obliged to take into account the original position of the Department of Transportation and rule in their favor. No, no, no, Your Honor, that's actually not my case. That's the case that Mr. Gaiman is going to argue, but my point is a subtler one. My point is that the FCC was obligated to give DOT's views in this matter considerable weight. And they were obligated to do that for a number of different reasons, right? One is the Transportation Equity Act, but the other is that the DOT is the expert agency on these matters of transportation policy, and the FCC is not. And even if the Transportation Equity Act did not exist, our point in our opening brief is that the commission didn't give sufficient weight to what DOT and other transportation safety stakeholders, not just DOT, it's also that all 50 state DOTs who are my clients, every other transportation safety stakeholder, all said 30 megahertz is insufficient. Who did the commission listen to? The commission listened to the cable industry. The commission listened to Open Technology Institute and Public Knowledge. If you look at footnotes 84 through 88 of the order, the part where the commission says, hey, we think that 30 megahertz is sufficient, those are the people that they're citing. And our point is it's arbitrary and capricious under any standard for the commission to take the word of the cable industry on transportation safety policy over the word of DOT, all of the state DOTs, all of the other transportation safety stakeholders who said, this can't work, and what you're doing doesn't fulfill the goals of the Intelligent Transportation Program. So take the TEA out of it. They still lose on arbitrary and capricious. Your clients didn't submit anything on standing or really argue it. What's the clients? I think we did recite in our brief, our clients are licensees in the ITS spectrum. We are dramatically affected by this order. ITS has licensees who will have to spend money to rip and replace their units with these new units that the commission wants them to install. But that's about the change from DRSC to CZ2X, and that's not, I thought that wasn't even challenged. No, I'm sorry, your honor. It's about both because our clients use the full spectrum now. And so we'll need to change their units to address this 60% smaller home that the FCC has given them. And so, yes, we are directly impacted by the order. And of course, both of us participated, both of these clients participated in the proceeding below. And so I think our standing is fairly self-evident. And in fact, I think the FCC acknowledged our standing on that point. Right. But we have an independent duty and typically we have a little bit more chapter and verse about, you know, which members of an association are doing what and actual evidence explaining, you know, averring to us, because this is the first article three court you're in, explaining to us what factual basis we can rely on for standing. Yes, your honor. I do believe that we addressed that in our brief and we made the point that we tens of thousands of these units that are operating across the country, those units are being operated by members of our association. Maybe in your reply, if you have a chance to look at your opening brief between now and then you could address the concern that you forfeited the argument that FCC's consultation with DOT was statutorily insufficient. Certainly, your honor, I will. Right. Colleagues, further questions? No. All right. Mr. Turner, I think we used all your time, but we will give you a couple of minutes for rebuttal. Thank you, your honor. All right. Now we'll hear from Mr. Geeman. Is it Geeman or Gayman? Gayman. Gayman. Good morning, Judge Pillard, and may it please the court. My name is Julian Gayman. I represent Amateur Radio Emergency Data Network, or ARDN. So I'm going to follow up on the judge's questions about how the order is inconsistent with the transportation statute. And as set out in our portion of the brief, our theory is that the FCC has limited rulemaking authority, limited to the final rule being not inconsistent with law. So I'm going to quickly run through three ways that the order is inconsistent with the transportation statute. First, the order outlaws DSRC and mandates CV to X. And this is inconsistent with the Congress's instructions that the Secretary must set ITS standards. The FCC is setting the ITS standard instead of DOT. Second, as you were previously discussing, the order finds that 30 megahertz is sufficient spectrum for safety-related functions. This is inconsistent with Congress's requirement that DOT define the communications requirements of the national architecture. Third, the order makes FCC licensees abandon the architecture. These are Mr. Tern's clients who simultaneously have an obligation to the FCC under their FCC license and also have an obligation under 23 U.S.C. 517D to follow the national architecture. And Mr. Tern's clients... Councillor, may I ask a question about standing here? Why do you have standing to complain about the change in character in the 30 megahertz bands? So we are challenging the entire order. No, no. I asked why are you injured by the change in character of the 30 megahertz? Sure. My clients are amateur radio licensees. They are secondary in status to either DSRC or cellular V to X. Either one of those. And so for them, the question is which system is easier to engineer around and not interfere with. And isn't the real truth that you want to keep an outmoded technology so there's more room for you to play? We take no position on what's current and what's outmoded. From an engineering... Then what is your injury? I don't get it. From an engineering standpoint, it's easier for amateur radio to avoid interfering with DSRC than it is to avoid interfering with cellular V to X. Because the original technology is not used at all. So you don't have to worry about it. On the contrary, almost every ITS installation in the United States has been using DSRC. And if this order stands, they're going to have to change that technology to go to cellular V to X. Okay. And why does that cause injury to you? Okay. Cell towers are about 100 to 300, 400 feet high. When a radio signal is broadcast from a cell tower, it covers a very broad area. By contrast, DSRC, the incumbent technology, uses what are known as roadside units. They're about 25 feet high. They're spaced alongside of a freeway or a road. They have a much smaller radio footprint. It's easier for amateur radio operators to avoid that radio footprint than a gigantic one that's put up by big cell towers. I see. And you're also taking the position that the departure from prior policy violates the TEA, not just the Administrative Procedures Act. And your strongest argument there? Our argument is focused on Section 303. 303R, the authority to engage in rulemaking. And our argument is that the FCC overstepped its statutory authority to engage in rulemaking by putting out an order that is inconsistent with Department of Transportation's authority. And the authority that you're pointing to that the Department of Transportation gained in the Transportation Equity Act is exactly what? 23 U.S.C. 517A1, the Secretary shall develop and maintain a national ITS architecture and supporting standards and protocols. The definition of architecture includes the duty to define communications requirements. That has to do with how much spectrum is available to satisfy the information flows that the architecture anticipates. Also, supporting ITS standards. As I've already mentioned, the switch from DSRC to cellular V2X, that usurps the Secretary's authority to set that standard. Do my colleagues have further questions? No. All right. Mr. Gaiman, did you intend to reserve any time for rebuttal? Yes. 30 seconds, please. All right. We'll give you 30 seconds after we hear from Mr. Nowak. Mr. Nowak, you may proceed when you're ready. Good morning, Your Honors, and may it please the Court. The FCC made a reasonable, record-based determination that retaining 30 megahertz of dedicated 5.9 gigahertz spectrum will serve all demonstrated transportation needs, and that it's neither necessary nor in the public interest to reserve an additional 45 megahertz of spectrum at the expense of other pressing public needs. The petitioners here have never clearly demonstrated they would be offering any particular features in 75 megahertz of spectrum that won't be offered in 30 megahertz. What about Continental's position that they can't do the non-light-of-sight collision avoidance without broader spectrum? And Mr. Turner's point that when you recited that the 30 megahertz was sufficient, you're really looking to cellular comments and not to the transportation industry. Yes. So taking those in turn, first with respect to Continental's comments that were discussing what it called collective reception messages, the problem there, Judge Pillard, is that the petitioners haven't pointed to any evidence in the record to support or substantiate any claims about those features. Vague allegations about what you might hope to do one day in the future aren't enough. There has to be some sort of substantiation, some sort of evidence that this is really feasible and that we're likely to see it deployed. But they haven't given us anything here or pointed to anything in the record other than their own say-so, other than take our word for it. There's a little bit of a chicken and egg problem here in that these are technologies that to bring them online, it takes a lot of investment, a lot of infrastructure. And so entities need to know, commercial actors need to know, is this going to be there if we build, is the spectrum to use this going to be there? And I take your position to be, if it's somewhat more on the horizon, we would consider it. But what needs to be shown for the go-ahead to be given? What more needs to be shown? Because they are saying, they do make an empirical case that, yeah, it's in the future, but it's coming and it does need more spectrum. Your Honor, just with respect to your point about the chicken or egg issue, the commission made clear in this order, you know, in the further notice for us we're making at paragraphs 189 to 192, that if this technology is one day successively developed, if there's a need, the commission is ready and able to make other spectrum available. So I don't think that's an issue. Now, I don't think this is a case where, this is a question on the margins that might be difficult about when is this technology coming? This is one where there was a real dearth of any evidence in the record to demonstrate when or if it might come to fruition. And in terms of what evidence there might be, I mean, if they could point to some evidence that someone has developed working demonstrations of this technology, even in a lab, or is close to doing so anytime soon, but here we have just a dearth of any evidence in the record beyond a self-serving assertion that is not substantiated by any sort of evidence. And the commission reasonably found that given the state of this record, this is entirely too uncertain and remote to justify holding spectrum in reserve at the expense of other pressing needs. Do you think of petitioner's argument that you could require the development of the technology? The petitioner's argument, as I understood it, about build-out requirements was not about requiring the development of this particular technology. And we don't have any reason to believe this technology ever could be successfully developed. It's been over 20 years since the spectrum was made available. And there's no evidence that anyone has gotten anything off the drawing boards with respect to this. I mean, the argument of build-out requirements was different. That was just saying, we will deploy existing developed features, basic safety messages to 5 million vehicles within X number of years. And that simply isn't responsive to the problems that the commission was dealing with here. Given the speculativeness, is that something we should look at under the APA or is that itself a standing problem? The speculativeness of the harm because they haven't alleged enough concrete that they even have a dog in that fight. It's an interesting question, Your Honor. We haven't challenged their standing here. I do think that it's on very shaky ground. Of course, from our standpoint, we'd be happy to have the court address this on the merits because we think that we clearly prevail on the merits about this. There's gotta be some greater information. And I wanna stress that requiring the commission to hold spectrum in reserve and to do so indefinitely, which seems to be what's being sought here, it's been 20 years already, has significant real world costs. So on this record, the commission couldn't justify doing that. And again, if circumstances change and there is a need for additional spectrum later, the commission has said that it stands ready and able to make other spectrum available. But we had to make the decision based on the record that's in front of us. And the record here simply didn't have any sort of tangible evidence that could substantiate any representations that were being made about this technology. Can I ask you about the duty to consult? What do you think that entails? The record does not suggest that the commission did any outreach to the Department of Transportation other than the notice of proposed rulemaking and accepting comments. I don't think that's correct with respect to the record, Your Honor. And I'll just point out that as several judges recognized, the petitioners didn't raise this argument in their opening brief. So we didn't have an opportunity or occasion to go into more detail. But the record here establishes that the Department of Transportation provided multiple rounds of feedback, not just on the public and PRM and the order, but that the FCC shared with them private advanced drafts before anything went out to the public and there were private advanced consultations. You'll see that- Where do we see that? Yeah, go ahead. So pages 386 to 414 of the joint appendix is a letter from the Department of Transportation commenting on a private pre-release draft of the notice of proposed rulemaking. Pages 563 to 576 is a letter from the Department of Transportation commenting on a private pre-release draft of the order. And the record reflects the commission made modifications in response to those private Department of Transportation comments before anything ever went out to the public. You'll see that, for instance, at page 536. And then on top of all of that, our staff informed me that prior to the coronavirus pandemic, there were in-person meetings between FCC staff and Department of Transportation staff to discuss these concerns. So I think by any standard- The timing of those even generally, I mean, it was before this order went out? Yes, Your Honor. So we simply think that by any reasonable standard, there was ample consultation here. That's very helpful. The- You may have already said this, but one, I think part of a compound question that I asked you was whether, what would be enough? I mean, I think it was Continental says, actually this non-light-of-sight perception and maneuver coordination technology is like within three years of being able to be deployed. If they had evidence of that, is that enough? I mean, again, there's this issue of investment and reliance planning. What is enough for some future, very beneficial safety technology to command the commission's interest in terms of spectrum allocation? So there has to be some level of substantiation and we fully recognize there could be close cases. I do think if there was evidence of significant development that gave real reason to believe that this was likely to be deployed within three years, within some reasonably foreseeable amount of time that might let you make some sort of reliable predictions. The issue here, of course, is just a complete dearth of evidence in the record that I think makes this an easy case and doesn't provide cause to hold spectrum in reserve. And I think the commission pointed additionally to the fact that this is not something new. This is spectrum that was allocated originally in 1999 and you don't see any meaningful deployments, even a quote unquote existing features that have been developed, which really calls into question any predictions now being made about the future, about advanced technologies that as far as we can tell are not meaningfully in progress in a way that gives any degree of confidence that this is something that could be deployed. I think in this circumstance, it was entirely appropriate for the commission to decide that as between holding spectrum in reserve at the expense of current pressing needs or dealing with other present needs and given the availability potentially of other spectrum should this technology be developed, this was an eminently reasonable decision I think under the APA. How difficult is it to claw back spectrum once it's been allocated to unlicensed use as here? And when you talk about other spectrum that wouldn't be adjacent, would it? So how much does this foreclose rather than just postpone the kind of consideration that Mr. Turner's clients are asking for and Mr. Gammon's clients are asking for? So your honor, I think you're right that we're not suggesting that it would necessarily be clawing back the same spectrum here, but my understanding of the record is that any mid band spectrum would suffice. So it's different spectrum ranges that have different properties, but this non-line of sight property is not limited to this narrow 45 megahertz we're talking about, it deals with an expanse. And I think you'll see that the commission has been actively engaged in a number of techniques to make spectrum available when needed. I mean, you see it here, we're able to move spectrum around. If you look at the PSSI case, it's heavily cited in the briefs. The commission took steps to make additional spectrum available. So there's been no reason to think that it wouldn't be possible to make suitable spectrum available. We're not saying it would necessarily be the same particular 45 megahertz of spectrum, but nothing here rises the level of the showing that the commission wouldn't be able to suitably deal with this problem. Were we to ever hit a point where this appeared to be a problem? My only other question is about the, whether it really is reasonable to say that this duty to consult with and consider the spectrum needs of the intelligent transportation system was a one-time deal in 1999, 2000. And whether you're really taking the position that the obligation of the commission, apart from sort of the ongoing APA obligation to consider all comments, that the obligation under the Transportation Equity Act is over. Your Honor, it's not a position that we're pressing. We're not arguing we didn't need to consult. We're telling you we did actively consult and simply as a good governance measure, you're going to expect agencies like the FCC to do this. So I think that's a little bit of a mood issue. I do see that it's a little bit questionable whether that consultation is required, but the commission here chose to do so. Now, what Mr. Turner was pointing to on this, I believe is paragraph 123 of the order. And I think the petitioners have persistently misread what's being done there. And I think it's helpful to step back and recognize there are really two different doctrinal issues here that is important to keep analytically distinct. One is the question of whether the FCC had statutory authority to manage the spectrum. And then there's a separate question under the APA about whether the commission's exercise of authority was reasonable. And paragraph 123 of the order was responding to arguments about the commission's statutory authority. The heading there, statutory considerations, it refers to statutory duties, and it correctly says that as a purely statutory matter, the Transportation Equity Act simply directed the commission to conduct a rulemaking and to consider the spectrum needs of vehicular communications, and in no way restricted the commission's statutory authority to manage that spectrum. Now, whether a given action taken under that authority is reasonable is really a separate question under the APA. And when managing spectrum for vehicular communications, the commission always has considered policy goals like those in the Transportation Equity Act that Congress has set forth in other relevant statutes. Do my colleagues have questions? Let me ask one question about the future. Before I do, let me see if I have my terminology right. The spectrum that's been newly made available, is that spectrum for unlicensed Wi-Fi uses? What's the right term for that? Yeah, so the right term would be that we have repurposed the lower 45 megahertz for unlicensed use. Well, let me ask, am I right that there's a very broad range of spectrum beginning around five gigahertz that's now available for unlicensed use? And then there's also very broad range of spectrum at six gigahertz that's available for unlicensed use. And the only thing in between those two very broad ranges are now this very small sliver of 30 megahertz for intelligent transportation. Is that in the ballpark of correct? My understanding, it's a little bit more complicated than that, both with kind of what the quantity is in the five gigahertz band. I think it's around kind of five, eight. And I'm not sure whether there's anything else that potentially could operate in the middle. I mean, this 5.9 gigahertz sliver is not just intelligent transportation. It's never been exclusive to vehicular use. It's available for amateur radio operations, for instance. That's why we have the amateur data network as petitioners here. So that's always been shared between a few things, but I think it's generally correct. So that might mute this question, but how much jeopardy is that remaining 30 megahertz in the future? If it's the only thing standing between what would otherwise be a very, very kind of uninterrupted spectrum for unlicensed use. I guess there's maybe two things that you might mean by jeopardy, your honor. One is kind of an interference question and the commission here put in place ample interference protections to ensure that that would not suffer harmful interference from unlicensed use in adjacent bands. And then if you're asking about whether the commission might ever consider trying to reallocate this 30 megahertz, there's nothing on the horizon for that. If anything, I think what you'll see in this order is the commission embraced the importance of retaining it for vehicular communications and went out of its way to set up limits on adjacent use. I mean, for instance, you'll see that the power level restrictions that we impose on wireless devices are less than what wireless interests wanted. They wanted to be able to operate at higher power levels and the commission said, no, we are serious about retaining this spectrum for vehicular use and protecting it. We do value the features that are being provided in those 30 megahertz. So I don't think there's any reason to think that that spectrum is jeopardized given the commission's actions here. That's helpful, thanks. If there are no further questions from the court, then we simply ask that you deny the petitions of review and affirm the commission's order. Thank you. Thank you, Mr. Novak. I just want the record to reflect that Mr. Leach is here from the justice department. He's here. I take it in response to the order of the court to help us to understand why the department of justice wrote the brief, not the FCC and what were to take from that given that the department of transportation would ordinarily be represented by the justice department and the FCC by itself. Does anybody have questions for Mr. Leach before we proceed to rebuttal? I thought his letter made clear. All right. We appreciate your being here, Mr. Leach, the courtesy that that shows to the court in case we did have follow-up questions on the issue identified in the order. So we'll proceed to hear briefly from Mr. Turner and then even more briefly from Mr. Gaiman in rebuttal. So thank you, Judge Pillard. I just wanted to hit one point. You mentioned regulatory certainty and isn't regulatory certainty important? And it absolutely is. And one thing that the commission has not talked about and they sort of don't talk about at all is that the commission itself played a huge role in making sure that these deployments didn't happen. And as we mentioned in our brief, in 2018, two commissioners sent a letter to the Toyota Motor Company saying, hey, we understand that you're about to deploy DSRC radios in your 2021 model year cars. We want you to be aware that that spectrum may go away. And Toyota received that message and did not deploy those radios in its car. And so I think it's important to understand that when the commission says, hey, there's no evidence of commercial deployment, current commercial deployment, that's the language that they use in the order. What they're saying is our efforts to make sure that deployment didn't happen prior to this order taking effect were effective. And Toyota got the message and didn't deploy the radios that it was otherwise planning to deploy. The example that you use is of DSRC, you're not objecting to the shift away from DSRC, but you're using that more in a more illustrative way that there's a sort of a signaling back and forth when the commission says we're gonna be stingy about something that the industry is gonna be prompted not to do the very development that the FCC would need. Correct, and if your honors haven't had a chance to read that letter, that's J579, I would urge you to do so. It's pretty brief, but it's kind of a striking illustration of what we're talking about. Because yes, it's illustrative of industry receiving the message from the commission that the spectrum is in jeopardy and not wanting to devote precious time and resources to deploy spectrum or to deploy technologies that they're not gonna be able to use. But we don't have a similar letter. I understand that at the general level that that's an example, but we don't have such a back and forth about the taking away the 45 megahertz of the spectrum. That's an analogy you're making about the DSRC, to which I understand Mr. Gaiman objects, but I understand you're not objecting. Well, no, your honor, I wanna be clear about this because what the FCC says is that this spectrum and Mr. Novick said this in his presentation. He said, one of the reasons that we don't believe that the additional 45 megahertz is necessary is because we don't trust what the Department of Transportation is telling us. We don't trust what the transportation sector is telling us because they haven't deployed even DSRC, even the basic safety message in any commercial deployments today. Now that ignores, as I already said, that there are tens of thousands of these things out there that have been deployed by my clients. But it also ignores that the reason that there were no commercial deployments is in part because the commission was very clear that it didn't want those commercial deployments to proceed. And so it's a two-fold thing. Yes, it's about regulatory certainty. And there has been plenty of other regulatory uncertainty in this proceeding, not just that Toyota letter. There was the testing program that the commission walked away from, right? The commission had this program to decide whether or not it was possible to share these resources. That was going pretty well, but the commission decided, no, we weren't gonna- All right, yeah, we're familiar with the record and I'm sorry to cut you off. I've got some of your time with questioning, but unless my colleagues have questions- Well, Your Honor, if I could address the point that Judge Walker made about surplusage. He asked me to look in the brief. Oh, yes. Yeah, so I just wanted to point out in page 37 of our brief, we say, the commission seeks to read this provision out of the statute violating an elementary canon of construction, talking about the duty to consider in consultation with Secretary Spectrum needs. We didn't lay that argument out fully in our opening brief because it wasn't until the commission's brief that we saw the commission say, oh, well, we did consult. And it was only once we had them saying, oh, no, no, no, actually we did consult and sort of pointing to the Ketawa case and saying, that's a consultation case. I mean, they know how to make the consultation argument. It was only once we had that argument in their brief that we had to respond to it in the way that we did in our reply. So I think we've preserved that argument because we were the ones who first raised the idea that they had ignored that duty in the statute. Thank you. All right, Mr. Gaiman, we'll hear briefly from you. And the court clerk helped Mr. Gaiman. He's having trouble unmuting. I don't know if that's all within his- Has that Mr. Gaiman requests to unmute? Mr. Gaiman, there should be a box on your screen. If you could just click okay or accept. I believe Mr. Gaiman is probably switching to his phone audio. I have nothing further. All right, thank you for your ingenuity in communicating with us. And we appreciate the arguments of all counsel. The case is taken under advisement.
judges: Pillard, Walker, Silberman